**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

KONINKLIJKE LUCHTVAART MAATSCHAPPIJ,
N.V. a/k/a KLM ROYAL DUTCH AIRLINES,

                        *Plaintiff*,                Civil Case No: _____

-against-

CENTURION AIR CARGO, INC., SKY LEASE I,      **COMPLAINT**
INC., AND ALFONSO CONRADO REY,

                        *Defendants*.

-------------------------------------------------------------------x

       Plaintiff KONINKLIJKE LUCHTVAART MAATSCHAPPIJ, N.V., by its attorneys, Condon & Forsyth LLP, alleges the following:

**JURISDICTION AND VENUE**

1.      Plaintiff KONINKLIJKE LUCHTVAART MAATSCHAPPIJ, N.V. ("KLM ROYAL DUTCH AIRLINES" or "KLM") is a corporation organized and existing under the laws of the Netherlands which maintains its principle place of business in the Netherlands.

2.      Defendant CENTURION AIR CARGO, INC. ("CENTURION") is a corporation organized and existing under the laws of the State of Florida and which maintains its principal place of business in the State of Florida at 4640 NW 36th Street Miami, FL 33166. Defendant CENTURION was formerly engaged in the business of air cargo transport.

3.      Defendant SKY LEASE I, INC. ("SKY LEASE") is a corporation organized and existing under the laws of the State of Florida and which also maintains its principal place of business in the State of Florida at 4640 NW 36th Street Miami, FL 33166. Defendant SKY LEASE is engaged in the business of air cargo transport.

1

4.      Defendant ALFONSO CONRADO REY ("REY") is a U.S. citizen domiciled in the State of Florida.  Defendant Rey is the owner and Chairman of defendant Centurion Air Cargo, Inc., the owner of defendant Sky Lease I, Inc., and the member owner of fifty percent (50%) of non-party Turbine Support International, LLC, a Delaware limited liability company ("TSI").

5.      The matter in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00).

6.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship between the parties.

7.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because the agreements that give rise to this action are governed by New York law and contain forum selection clauses which designate the United States District Court for the Southern District of New York or another competent court in the Borough of Manhattan, New York City as the venue for this action.

## STATEMENT OF FACTS

8.      This action arises out of numerous agreements between an American cargo carrier and a Dutch transportation and engine maintenance company regarding aircraft engine work performed in the Netherlands and Florida.

9.      KLM Royal Dutch Airlines is a Dutch company in the business of international transportation by air as well as aircraft maintenance service.

10.     Centurion Air Cargo was a Miami-based air cargo carrier that operated from 1991 until 2016.

11.     Alfonso Rey is the Chairman of Centurion, and at all relevant times has been the owner of both Centurion and Sky Lease.

12.     On November 22, 2012, KLM and Centurion entered into Service Agreement Number KL20120160 ("the Service Agreement") pursuant to which KLM would perform aircraft engine maintenance, overhaul, repair, and modification services for Centurion.

13.     Centurion also leased several engines from KLM on or about October 5, 2012 pursuant to Lease Number KL20120160-LEASE ("the Lease").

14.     The Service Agreement, the Lease, and all schedules, annexes, exhibits and change orders thereto will be collectively referred to as "the KLM-Centurion Agreements."

15.     Centurion failed to pay numerous invoices under the KLM-Centurion Agreements.

16.     By October 7, 2014, Centurion owed KLM $5,815,000.00 plus $127,950.00 interest pursuant to the KLM-Centurion Agreements, for a total debt of $5,942,950.00.

17.     To resolve this debt, KLM negotiated a settlement with Centurion and Rey which was memorialized in a settlement agreement ("the Settlement") and a pledge agreement in guarantee of the settlement agreement ("the Pledge").

18.     In the Settlement, Centurion acknowledged that it had defaulted on the KLM-Centurion Agreements, and that its outstanding debts were valid and enforceable obligations.

19.     The Settlement required Centurion to pay $5,942,950.00 over twenty-four months in predetermined installments.

20.     In exchange, KLM agreed to credit Centurion's payments pursuant to the schedule set out in the Settlement and to forego the additional interest that would have accrued during the twenty-four months covered by the payment schedule.

21.     The Pledge guaranteed Centurion's payments. In the event Centurion defaulted on its payment obligations under the Settlement, Centurion and Rey granted KLM "a first priority lien upon and security interest in" Rey's fifty percent share in TSI and a loan receivable to Centurion

from Bonus Aerospace, Inc. ("Bonus Aerospace") in the amount of $1,093,823.00 plus accrued interest. In addition, in the event of a default by Centurion, Rey granted KLM the right to purchase Rey's fifty percent share in Turbine Support International, LLC ("TSI") for $2,268,588.50 less the amount Centurion still owed KLM under the Settlement on the date KLM exercised its right to purchase the shares.

22. TSI has two shareholders, one of whom is Rey.

23. The Pledge terminates, and Rey and Centurion are released from their guarantor obligations, upon the payment in full of all sums due and payable under the Settlement.

24. The Settlement and the Pledge were agreed to and signed by Centurion, Rey, KLM, TSI, and Bonus Aerospace on November 19, 2014.

25. Centurion made payments pursuant to the Settlement but stopped in July 2015, leaving an unpaid balance of $4,135,000.00.

26. On or about December 31, 2016, Centurion ceased all cargo transportation operations.

27. On January 19, 2017, Centurion notified the Department of Transportation that it had not operated under its economic authority since December 31, 2016.

28. On January 24, 2017, the Department of Transportation suspended Centurion's authority to operate pending a re-determination of Centurion's fitness.

29. On May 21, 2018, Centurion notified the Department of Transportation that it would not seek to resume operations.

30. On June 1, 2018, Centurion voluntarily surrendered its air carrier operating certificate (AOC) to the Federal Aviation Administration.

31. On August 17, 2018, the U.S. Department of Transportation issued an Order revoking Centurion's AOC for reason of dormancy.

32. In or about 2015, Centurion guaranteed Sky Lease's payments in connection with a settlement agreement between Sky Lease and one of its creditors.

33. On information and belief, prior to January 1, 2017, Centurion transferred three of its aircraft (one Boeing 747 and two McDonnell Douglas MD-11's) to Sky Lease.

34. On information and belief, those three aircraft operate under the Sky Lease call sign and comprise the majority of Sky Lease's current fleet.

35. On information and belief, Centurion and Sky Lease share the same top management, including the same owner and the same Director of Engineering.

36. Centurion and Sky Lease share a physical address.

37. Centurion's website directs all inquiries to the telephone number 833-877-3782, which is the same number Sky Lease lists on its website for sales inquiries.

38. Extensive negotiations between the parties have been unsuccessful in resolving the disputes which are the subject of this action.

39. On September 4, 2018, KLM served Centurion with a Notice of Default on its obligations under the Settlement.

40. On September 18, 2018, KLM served Rey with an Exercise Notice as required by the Settlement.

41. On September 18, 2018, KLM served Bonus Aerospace with an Exercise Notice as required by the Settlement.

42. To date, Rey has failed to tender his pledged share in TSI.

43. To date, Centurion has failed to pay the balance it owes pursuant to the Settlement.

44. Centurion has also accrued additional debts under the KLM-Centurion Agreements since the Settlement was signed.

## AS FOR A FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT AGAINST REY

45. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 44 above as if fully set forth herein.

46. The Settlement and the Pledge are valid contracts which were entered into after extensive negotiations between sophisticated parties KLM, Centurion and Rey.

47. Rey breached his obligations under the Settlement and Pledge as set forth below.

48. In the Pledge, Rey "irrevocably and unconditionally guarantee[d] to [KLM] the due and punctual payment of the Outstanding Amounts in accordance with the provisions of the Settlement Agreement." Rey's guarantee obligations became "immediately due and payable" when "Centurion fail[ed] to make any payment under the Settlement Agreement when and as the same shall be due and payable in accordance with the Settlement Agreement," and are enforceable "irrespective of the validity, legality or enforceability of the [KLM-Centurion] Agreements or the Settlement Agreement, the absence of any action to enforce the same, the recovery of any judgment against Centurion, or any other circumstances whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor, except the defense that the sum claimed has actually been paid to [KLM]."

49. The substance of Rey's guarantee, as set forth in the Settlement, is that in the event Centurion defaulted on its payment obligations under the Settlement, KLM would have the right, "at its sole and absolute discretion, to purchase the Pledged Beneficial Interest from Rey at a purchase price equal to USD $2,268,588.50 … less the Outstanding Amounts" on the date of exercise.

50. Centurion breached the Settlement by failing to make any payments after July 2015, leaving an unpaid balance of $4,135,000.00.

51. On September 4, 2018, KLM served Centurion with a Notice of Default pursuant to the Settlement Agreement.

52. On September 18, 2018, KLM served Rey with a Notice of Exercise pursuant to the Settlement Agreement, in which it directed Rey to turn over his fifty percent share in TSI within five business days.

53. On September 18, 2018, the Outstanding Amounts were $4,135,000.00 plus interest.

54. The purchase price for Rey's fifty percent share in TSI was therefore $2,268,588.50 less $4,135,000.00 plus interest, i.e., less than $0.00.

55. When KLM properly exercised its rights pursuant to the Settlement and Pledge, Rey was validly contractually bound to tender the pledged collateral.

56. The obligations Rey undertook in the Settlement and the Pledge agreement are sureties.

57. Rey's obligations are clearly and precisely outlined in the Settlement and the Pledge such that no party could reasonably misunderstand them.

58. KLM has performed all of its obligations under the Settlement and Pledge. All conditions precedent required of KLM have been performed, have occurred, are excused, or have been waived.

59. Rey still owns a fifty percent (50%) share of TSI and is therefore capable of carrying out his obligations. However, Rey has refused to turn over his shares.

60. Rey has breached his obligations under the Settlement and Pledge by, among other things, failing to deliver to KLM his interest in TSI as required by Section 3.3 of the Settlement.

61. As a result of Rey's breach, KLM has suffered damages in excess of $75,000.00.

62. The appropriate remedy for Rey's breach is an order granting specific performance.

63. A damages remedy is inadequate as against Rey with regard to the Pledge guarantee because the subject matter of plaintiff's loss is a fifty-percent share in TSI, a closely-held LLC.

64. Shares of closely-held LLCs, including TSI, are unique and have no established market value.

65. A damages remedy is further inadequate as against Rey because the Settlement specifies that execution of the Pledge is KLM's recourse against Rey in the event of Centurion's default on the Settlement.

66. Therefore, unless KLM is granted specific performance of the Pledge against Rey, KLM will suffer injuries for which plaintiff has no adequate remedy at law.

67. Accordingly, KLM is entitled to an order granting specific performance of Rey's obligation to tender his fifty percent share in TSI to KLM.

68. Alternatively, if KLM is not entitled to specific performance of Rey's obligation to tender his fifty percent share of TSI to KLM, or if specific performance is impossible, KLM is entitled to recover actual damages resulting from his breach of the Settlement and Pledge Agreements.

69. KLM has incurred and is entitled to recover its reasonable attorneys' fees incurred in enforcing the Settlement and Pledge.

### AS FOR A SECOND CAUSE OF ACTION: BREACHES OF VARIOUS CONTRACTS AGAINST CENTURION

70. KLM incorporates by reference the allegations set forth in paragraphs 1 through 68 above as if fully set forth herein.

71. KLM is entitled to recover from Centurion the amount due and owing pursuant to the Settlement as well as all damages it has incurred as a result of Centurion's breaches of the KLM-Centurion Agreements since the Settlement was signed.

72. As of the date of this filing, the amount due and owing pursuant to the Settlement is approximately $4,195,000.00 representing unpaid Settlement installments and accrued interest.

73. Centurion's failure to pay this amount constitutes breach of the Settlement.

74. Pursuant to the Settlement, KLM is entitled to the full unpaid balance of $4,195,000.00 plus interest and attorneys' fees.

75. In addition to what it owes pursuant to the Settlement, Centurion has refused to pay KLM's invoices for work KLM performed pursuant to the Service Agreement between 2014 and the present, specifically engine work KLM performed on engine numbers 702-358 and 702-546 and services rendered to Centurion by KLM engineer Cees de Regt.  KLM has invoiced Centurion for this work pursuant to the Service Agreement but the invoices remain unpaid.

76. The Service Agreement is a valid and binding contract which requires timely payment of invoices, and each failure by Centurion to pay a valid invoice under the Service Agreement constitutes a separate breach of contract.

77. Also between 2014 and the present, Centurion leased two engines numbered 702-987 and 704-245 from KLM pursuant to the Lease.

78. KLM invoiced Centurion for rent on these engines pursuant to the Lease.

79. Centurion has refused to pay KLM's invoices for rent on engine numbers 702-987 and 704-245, which are due and owing under the Lease.

80. The Lease is a valid and binding contract which requires timely payment of invoices, and Centurion's failure to pay these invoices constitutes a breach of the Lease.

81. Despite having breached the Lease, Centurion has wrongfully retained possession of engine number 704-245, resulting in a loss of use to KLM for which it is entitled to damages.

82. As a result of Centurion's breach of the Settlement, repeated breaches of its obligations to pay invoices under the Service Agreement and Lease, and wrongful retention of engine number 704-245, KLM has incurred damages in excess of $8,683,000.00.

83. KLM is entitled to recover in excess of $8,683,000.00 in damages from Centurion, plus interest dating from each breach of contract, as well as costs and attorneys' fees incurred in enforcing its rights under the Settlement.

## AS FOR A THIRD CAUSE OF ACTION: CONVERSION AGAINST CENTURION AND SKY LEASE

84. KLM incorporates by reference the allegations set forth in paragraphs 1 through 82 above as if fully set forth herein.

85. Centurion originally had possession of KLM's Engine 704245 ("the Lease Engine") pursuant to Agreement No. KL20120160-LEASE ("the Engine Lease") between KLM and Centurion.

86. Article 8.4 of the Engine Lease limits Centurion's possession of the Lease Engine as follows: "Lessee shall not be entitled to sublease the Lease Engine to any third party, nor to install the Lease Engine on any Aircraft other than Aircraft operated by the Lessee, unless agreed upon in writing by Lessor."

87. Article 12.1 of the Engine Lease further states: "The Lease Engine will remain the property of the Lessor. The Lessee is only permitted to sell, hire or otherwise put the Lease Engine at the disposal of third parties after the prior written consent of the Lessor."

88. Centurion transferred possession, subleased, and/or sold the Lease Engine to Sky Lease without KLM's authorization.

89. Centurion never sought or received written permission from KLM for its transfer of the Lease Engine to Sky Lease.

90. Although Centurion's initial possession of the Lease Engine was lawful, Centurion knew that the transfer of the Lease Engine to Sky Lease without prior written permission was wrongful and constituted a material breach of the Lease.

91. Centurion also refused to pay KLM's invoices for rental fees on the Lease Engine which are due and payable under Article 4 of the Lease. This failure to pay constitutes a separate material breach of the Lease.

92. KLM has repeatedly demanded the return of the Lease Engine. Centurion has refused to comply, and its continued possession of the Lease Engine is also a material breach of the lease and is wrongful.

93. Each of the above breaches of the Lease is a material breach of which Centurion has actual or constructive notice and which Centurion failed to remedy, entitling KLM to immediate redelivery of the Lease Engine.

94. Centurion acted with hostility toward KLM's rights and title to the Lease Engine by transferring it to Sky Lease without prior written permission, refusing to pay rental fees, and refusing KLM's demand that it be returned. Centurion's transfer and refusal constitute conversion.

95. In addition, because Rey is the owner of both Sky Lease and Centurion, both entities knew of KLM's rights to the Lease Engine. Therefore, Sky Lease's acceptance and continued use of the Lease Engine is wrongful and constitutes conversion.

96. Based on the foregoing, Centurion is in breach of the Lease and KLM is entitled to repossess the Lease Engine or recover damages in an amount equivalent to its value.

## AS AGAINST REY, KLM MAY RECOVER UNDER A THEORY OF ALTER EGO LIABILITY

97. KLM incorporates by reference the allegations set forth in paragraphs 1 through 93 above as if fully set forth herein.

98. Rey operated Centurion in a manner that has undercapitalized Centurion, rendering it unable to operate or pay its debts to KLM.

99. Rey has also refused to make good on his obligations under the Pledge in guarantee of those debts.

100. KLM has been harmed by this conduct in that it remains unpaid for work it performed on Centurion's aircraft, which are now operating and generating income for Sky Lease and Rey.

101. KLM has been further harmed in that it remains unpaid for the services of one of its engineers, Mr. Cees de Regt, who has been stationed at Centurion and provided services to Centurion and Sky Lease which are beneficial to Sky Lease and Rey.

102. KLM has been further harmed in that it remains unpaid for numerous installments of rent for engines it leased to Centurion, which on information and belief are currently being used by Sky Lease, and are generating income for Sky Lease and Rey.

103. Rey has thus treated Centurion and Sky Lease as a single entity and exercised domination and control over them in a manner that has left Centurion with insufficient funds to pay its debts while permitting Sky Lease to carry on in business.

104. In light of the foregoing, Sky Lease and Centurion are the alter-egos of Rey.

105. KLM should therefore be permitted to recover damages from Rey personally for the wrongs he committed against KLM through Centurion and Sky Lease.

## AS AGAINST SKY LEASE, KLM MAY RECOVER UNDER A THEORY OF SUCCESSOR LIABILITY

106. KLM incorporates by reference the allegations set forth in paragraphs 1 through 102 above as if fully set forth herein.

107. After Centurion surrendered its air carrier operating certificate and thus ceased to do business as an air cargo carrier, Sky Lease continued to do business as an air cargo carrier using Centurion assets, which Rey continued to control by virtue of his ownership of both companies.

108. As set forth above, there is continuity of physical location, assets and general business operation between Centurion and Sky Lease. On information and belief, there is also continuity of management and personnel between Centurion and Sky Lease.

109. In addition, Centurion transferred its goodwill and customer base to Sky Lease by directing all visitors to its website to call the Sky Lease sales number.

110. The transfer of Centurion's operations to Sky Lease was a de facto merger and/or a mere continuation of Centurion's business.

111. Therefore, KLM is entitled to recover against Sky Lease under a theory of successor liability.

## DEMAND FOR RELIEF

**WHEREFORE**, KLM respectfully requests:

1. An order granting specific performance of Rey's obligation to turn over his fifty percent share in TSI;

2. A judgment against Centurion in the total amount it owes under the Settlement and the KLM-Centurion Agreements, plus interest;

3. An order compelling Centurion and/or Sky Lease to return possession of engine number 704-245 to KLM or, in the alternative, a judgment in the amount of the engine's value;

4.  A judgment that Rey is personally liable for the damages claimed herein as an alter-ego of Centurion;

5.  A judgment that Sky Lease is liable for the damages claimed herein as Centurion's successor;

6.  Reasonable attorneys' fees, disbursements, and costs of suit; and

7.  Such other and further relief as this Court may deem just and proper.

CONDON & FORSYTH LLP

Dated: New York, New York
November 27, 2018

By: _____
Bartholomew J. Banino (BB 4164)
Zachary Groendyk (ZG 0239)
7 Times Square
New York, New York 10036
bbanino@condonlaw.com
zgroendyk@condonlaw.com
(Tel.): 212-894-6818
(Fax): 212-370-4453

*Attorneys for Plaintiff*
KONINKLIJKE LUCHTVAART
MAATSCHAPPIJ, N.V.